Filed 6/28/24  P. v. Hall CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>ANDREW ALBERT HALL,<br><br>　　　Defendant and Appellant. | A165142<br><br>(Contra Costa County<br>　Super. Ct. No. 01001959303) |

Defendant Andrew Albert Hall appeals from a judgment of conviction and sentence imposed after a jury found him guilty of assault with a firearm (Pen. Code, § 245, subd. (a)(2)).[1]  He contends the trial court erred by excluding evidence of an internal Sheriff's Department report that had cleared him of violating departmental policy and expert testimony confirming that he violated no policy.  Hall further contends the court erred by failing to instruct the jury on defense of others as to the assault charge.  We will affirm the judgment.

## I.  FACTS AND PROCEDURAL HISTORY

The Contra Costa County District Attorney filed an Information charging Hall, a Contra Costa County Deputy Sheriff at the time, with

---

[1]　Except where indicated otherwise, all statutory references are to the Penal Code.

voluntary manslaughter (§ 192, subd. (a); count 1) and assault with a firearm (§ 245, subd. (a)(2); count 2) after he shot and killed a suspect following a vehicle pursuit. As to both counts, the Information alleged that Hall personally used a firearm (§ 12022.5, subd. (a)). As to count 2, the Information alleged that Hall personally inflicted great bodily injury (§ 12022.7, subd. (a)). The matter proceeded to a jury trial.

A. Prosecution's Case

1. Dispatch Call

Around 11:00 a.m. on November 3, 2018, dispatch for the Contra Costa County Sheriff's Department issued a call to patrolling units with a report of a suspicious person—subsequently identified as Laudemer Arboleda. The reporting party had called the police because Arboleda rang her doorbell and then walked around Laurel Drive in Danville.

Contra Costa County Sheriff's Deputies Nicholas Muller and Sonasi Maka responded in a patrol car as the primary unit. Deputy Charles Caruso, who had a civilian ride-along, advised that he would also address the call. Hall told dispatch he was making a vehicle stop of an unrelated vehicle.

2. Units Investigate and Pursue Arboleda

Deputies Muller and Maka arrived at the scene and observed Arboleda entering a silver Honda. They walked toward the Honda to make contact, and Arboleda drove away. Deputy Caruso, who also arrived at the scene, noted Arboleda's license plate.

The deputies followed the Honda without activating their lights. Based on the license plate number provided by Deputy Caruso, dispatch advised that the Honda was not reported stolen or associated with any warrants or alerts.

2

Eventually Arboleda stopped. Deputy Muller got out of his patrol car and tried to wave Arboleda down, but he drove away. The deputies followed him. Arboleda increased his speed to approximately five miles over the speed limit, and the deputies attempted to initiate a formal traffic stop by activating their overhead lights and emergency equipment.

Arboleda stopped again, and Deputies Muller and Maka attempted to contact him. Arboleda, however, drove away again. The two units followed Arboleda and attempted to pull him over, taking turns being primary and secondary units, but Arboleda continued driving.

Around this time, Sergeant Chris Martin—the supervisory deputy on shift—left the station and drove toward the pursuit in case the responding units required assistance, advising dispatch.

Meanwhile, Arboleda ran a stop sign and turned onto Laurel Drive. At this point, he was driving "a little over" the speed limit. On Laurel Drive, the deputies pulled him over. Deputy Muller got out of his patrol vehicle and drew his firearm, but Arboleda drove away again.

Arboleda then turned onto Hartz Way and parked. Deputies Muller, Maka and Caruso exited their patrol cars with guns drawn and ordered him to stop. Muller thought Arboleda looked "zombie-ish, kind of maybe out of it." Thinking Arboleda did not present a danger to the deputies, Muller said, " 'let him go, don't shoot, don't shoot' " as Arboleda drove off once again, going westbound on Hartz Way. Muller advised dispatch that they had approached Arboleda at gunpoint but he drove away.

Arboleda turned onto Front Street, and the two assigned patrol units continued their pursuit. Deputy Muller was again in the lead vehicle and advised dispatch they were traveling north on Front Street at speeds of 30 or 35 miles per hour in light traffic.

3

### 3. Hall Joins the Chase and Kills Arboleda

Near the intersection of Front Street and Diablo Road, Sergeant Martin and Hall converged on Arboleda. As Sergeant Martin approached, he saw Hall's patrol car turning onto Diablo Road. Martin turned behind Hall, just as Arboleda and the two assigned units arrived at the location from the other direction. Hall stopped in front of Arboleda's Honda and got out of his vehicle. Sergeant Martin stopped some feet away from Hall's car, leaving a narrow gap between the two patrol vehicles, but stayed in his vehicle. Arboleda's Honda began to roll forward while Hall walked to the back of his patrol car. Martin thought that Hall had entered the gap between Hall's vehicle and Martin's vehicle, that Arboleda was attempting to maneuver through that gap, that the gap was too narrow for him to do so, and that his Honda was going to hit Hall. Deputy Muller also thought Hall was at risk of being hit. Deputy Caruso saw Arboleda driving in Hall's direction and did not think Arboleda would fit through the gap.

Hall, who had already drawn his firearm, fired 10 shots at Arboleda. Sergeant Martin heard the gunshots as Arboleda was driving between the two patrol vehicles. Because the shots were coming from Hall toward Arboleda and Martin's vehicle, Martin, who was still sitting in his vehicle, was afraid that he (Martin) would be hit by gunfire. Nine of Hall's shots hit Arboleda, and one of them was fatal. After Arboleda was shot, his car continued moving and crashed into a bystander vehicle. The Honda never struck Hall, Hall's vehicle, or Martin's vehicle.

### 4. Accident Reconstruction

California Highway Patrol Officer Victor Ruiz, an investigator with the Multi-Disciplinary Accident Investigation Team specializing in accident reconstruction, testified that Arboleda was traveling approximately six miles

per hour five seconds before the crash. Four and a half seconds before the crash, Arboleda was engaging the brake pedal. Three and a half seconds before the crash, Arboleda's car was traveling at five miles per hour. Two and a half seconds before the crash, Arboleda's car was traveling 11 miles per hour. By the time of the crash, it was traveling 25 miles per hour. Ruiz confirmed that Arboleda braked after entering the gap between the patrol vehicles and then accelerated after a couple of seconds. He also agreed that video from Hall's body-worn camera showed the wheels of Arboleda's car were pointed toward Hall.

### 5. Evidence of Policies on Pursuit, Stops, and Shooting

Sergeant Martin testified regarding the Danville Police Department pursuit policy at the time.[2] "Normally pursuits should be limited to two units, a primary and a secondary unit, unless in the supervisor's judgment additional units are necessary." (Bolding omitted.) Although other units who hear the broadcast about the pursuit are to move to the area to assist and "remain alert to the pursuit progress and location," they should "stay off the air and away from the pursuit." (Bolding omitted.) "Barricading a roadway should be avoided unless necessary to safely end a pursuit and shall not be undertaken unless authorized by the patrol supervisor." Martin acknowledged that it was standard for officers to draw their weapons at the end of a pursuit.

Mark Johnson, a Lieutenant at the Contra Costa County Sheriff's Department (Sheriff's Department), testified about the California Peace Officer Standards and Training and the training Hall received. Johnson

---

[2] Sergeant Martin explained that "the town of Danville is a contract city for the sheriff's office; the sheriff's office supplies their sworn personnel. Their police officers are also sheriff's deputies."

explained that a vehicular pursuit usually results in a high-risk stop, in which a primary officer typically gives commands to the suspect and a secondary officer ensures that the primary officer and bystanders are not in danger. Hall was trained to communicate with fellow officers and dispatch before and during a high-risk stop, to know the location of other officers and civilians so cross-fire and injury can be avoided, to maintain 20–30 feet between his patrol car and the suspect vehicle, to conduct the stop from behind the vehicle, to weigh whether the need for immediate apprehension outweighs the danger created by the pursuit, and to not drive straight toward the suspect vehicle. Hall was also trained on barricade policy, which provides that barricading a roadway should be avoided unless necessary to safely end a pursuit and shall not be undertaken unless authorized by the patrol supervisor, in order to avoid a collision or the suspect's flight into other traffic lanes or onto a sidewalk. Johnson confirmed that officers who are not primary or secondary units are to stay away from the pursuit unless they have permission to join.

Johnson further testified that officers are trained not to discharge a firearm at a moving vehicle except in defense of self or others. As Johnson explained, "[i]f a vehicle is moving and you shoot the driver, that vehicle has to go somewhere. Basically no one's in control of the car."

B. Defense Case

Deputy Caruso testified that one of the times the deputies stopped Arboleda, Caruso stood in front of Arboleda's car and pointed a gun at him. Arboleda rolled forward toward Caruso, and Caruso moved out of Arboleda's way, returned to his patrol vehicle, and continued the pursuit. Later he observed that Hall "had come off of Diablo and canted his car on Front Street . . . which stopped [Arboleda's] silver Honda from being able to go right there

6

in that direction." Then Sergeant Martin arrived and stopped alongside Hall's patrol car.

Dr. Rajeev Kelkar testified as an expert in accident reconstruction and biomechanics. According to Dr. Kelkar, nine seconds elapsed from the time Arboleda's car started moving to the time of impact with the bystander car on Diablo Road. According to the video footage, "five seconds before the impact, the Honda is in a sharp right steer maneuver to get past the front-end of the Martin police vehicle" and lightly braking. The speed of Arboleda's car increased "from about 6 miles per hour to between 12 and 15 miles per hour" during this time frame. Hall started shooting at Arboleda approximately 4.4 seconds after Arboleda began moving and stopped shooting approximately 2.2 seconds later. Arboleda's speed was six miles per hour when Hall first shot him and had increased to 12 miles per hour at the last shot. In short, Hall started firing about a half-second after Arboleda maneuvered around Martin's vehicle and toward Hall.

On cross-examination, Dr. Kelkar confirmed that Arboleda was braking as he drove around the front of Sergeant Martin's vehicle and did not fully depress the gas pedal until after Hall shot him. A study performed by The Foundation for Traffic Safety on the Impact Speed and a Pedestrian's Risk of Severe Injury or Death showed a near zero percent risk of severe injury from a vehicle traveling 10 miles per hour.

Jason Fries testified as a 3-D video reconstruction expert. Although he lacked expertise in accident reconstruction, he testified that Hall fired all ten rounds in 2.16 seconds, that Hall's center of mass was approximately six or seven inches from Arboleda's Honda less than a second after the first shot, and Hall was 0.6 feet from the Honda when he fired the third shot and 1.2 feet from the Honda when he fired the fifth shot.

7

C. <u>Jury Verdict and Sentence</u>

The jury deadlocked as to count 1 (voluntary manslaughter), with seven of 12 jurors voting for acquittal, but convicted Hall of count 2 (assault with a firearm). The jury also found true the allegations of personal use of a firearm and personal infliction of great bodily injury. The trial court sentenced Hall to six years in prison. Hall filed a timely notice of appeal.

## II. <u>DISCUSSION</u>

Hall contends the trial court erred by precluding him from introducing evidence that he did not violate departmental policy, which he claims was relevant to the prosecutor's arguments that Hall acted unreasonably and excessively. He further contends the court erred by not instructing sua sponte on defense of others on the count 2 charge for assault with a firearm. Relevant to both of these arguments are several instructions the court provided to the jury.

As to count 1 (voluntary manslaughter), the trial court instructed pursuant to CALCRIM No. 572. That instruction required the People to prove (1) that Hall committed an act that caused Arboleda's death and unlawfully intended to kill someone, or (2) that Hall intentionally committed an act that caused Arboleda's death and the natural consequences of that act were dangerous to human life, that Hall knew when he acted that the act was dangerous to human life, that Hall "deliberately acted with *conscious disregard for human life*," and that Hall "killed without lawful excuse or justification." (Italics added.)

Based on CALCRIM No. 505, the trial court also instructed on self-defense or defense of another as applied to manslaughter: "The defendant is not guilty of manslaughter, which is charged in Count 1, if he was justified in killing someone in *self-defense or defense of another*. [¶] The defendant acted

8

in lawful self-defense or defense of another if: [¶] 1. The defendant *reasonably* believed that he or Sergeant Martin was in imminent danger of being killed or suffering great bodily injury; [¶] 2. The defendant reasonably believed that the immediate use of deadly force was necessary to defend against the danger; and [¶] 3. The defendant used no more force than was *reasonably necessary* to defend against that danger. [¶] . . . [¶] The reasonableness of a particular use of force by a police officer must be judged from the perspective of a reasonable police officer with the same *knowledge and training as the defendant* rather than with the 2020 vision of hindsight. . . . The People have the burden of proving beyond a reasonable doubt that the killing was not justified. If the People have not met this burden, you must find the defendant not guilty of manslaughter."

Regarding count 2 (assault with a firearm), the trial court instructed pursuant to CALCRIM No. 875. That instruction required the People to prove that Hall acted with a firearm willfully and in a way that would by its nature directly and probably result in the application of force to a person, that Hall was aware of facts that would lead a reasonable person to realize that his acts by its nature would directly and probably result in the application of force to someone, that Hall had the present ability to apply force with a firearm to a person, and that Hall "*did not act in self-defense or in defense of someone else.*" (Italics added.)

The trial court thereafter instructed the jury with CALCRIM No. 3470, which gives the court the option of instructing on self-defense, defense of others, or both. This time, the court only chose to instruct on self-defense, and not defense of others: "Self-defense is a defense to voluntary manslaughter and to assault with a firearm. [¶] The defendant is not guilty of these crimes if he used force against the other person in lawful self-

9

defense. [¶] The defendant acted in lawful self-defense if: [¶] 1. The defendant reasonably believed *he* was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully while in a vehicular pursuit; [¶] 2. *The defendant reasonably believed that the immediate use of force was necessary to defend against that danger*; and [¶] 3. The defendant *used no more force than was reasonably necessary* to defend against that danger. [¶] Belief in future harm is not sufficient no matter how great or how likely the harm is believed to be. The defendant must have believed there was imminent danger of violence to *himself*. Defendant's belief must have been reasonable and he must have acted because of that belief. [¶] The defendant is only entitled to use that amount of force that a reasonable person would believe is necessary in this situation. [¶] If the defendant used more force than reasonable, the defendant did not act in lawful self-defense. [¶] *When deciding whether the defendant's beliefs were reasonable, consider all the circumstances as they were known to and appeared to the defendant* and consider what a reasonable person in a *similar situation with similar knowledge* would have believed." (Italics added.)

In light of these instructions, the issues for the jury included whether Hall acted with conscious disregard for life, whether he reasonably believed the immediate use of force was necessary, and whether he used more force than was reasonably necessary, based in part on Hall's knowledge at the time. Germane to the first issue on appeal—the exclusion of defense evidence—the prosecution attempted to prove these facts by emphasizing that Hall acted contrary to what he knew from his training, including departmental policy, and therefore acted with the mens rea needed for voluntary manslaughter and unreasonably for purposes of self-defense. Pertinent to the second issue on appeal—purported instructional error—the

10

trial court instructed under CALCRIM No. 875 that self-defense and defense of others were defenses to the assault with a firearm charge, but CALCRIM No. 3470 referred only to self-defense.

A. Exclusion of Evidence

Hall contends the trial court precluded him from introducing evidence relevant to the departmental policies relied upon by the prosecution. Specifically, he complains that he should have been able to introduce evidence of an internal investigation conducted by the Sheriff's Department, which found he had not violated departmental policy in regard to Arboleda's killing. He further contends the court precluded him from introducing expert testimony that he had not violated those policies. We conclude that, if any error occurred, it was harmless.

1. Procedural Background

Before trial, the prosecution moved to introduce evidence of the training Hall received on the use of force, high-speed pursuits, and high-risk stops. The prosecution also moved to exclude the evidence of Hall being cleared by the Sheriff's Department of violating internal departmental policies. Hall, meanwhile, moved in limine to exclude any "evidence or testimony that would claim or allege [he] violated departmental policies when he used force against Mr. Arboleda."

As characterized in Hall's opening brief, the 300-page Sheriff Department's report described an internal affairs investigation into the shooting. According to Hall, the report concluded: "The investigation did not reveal any violations of Contra Costa County Office of the Sheriff Policies and Procedures. Viewed objectively, the actions . . . concerning Mr. Arboleda were legal, proper, and in congruence with Contra Costa [County] Office of the Sheriff Policies and Procedures."

11

The trial court granted the prosecution's request to introduce evidence of Hall's training, as relevant to his state of mind.  The court further agreed with the prosecution that the Sheriff Department's internal investigation was not relevant to the issues at trial.  In addition, the court granted Hall's motion to exclude "references to alleged policy violations, . . . because it's not going to be couched in terms of policy violation or no violations, but it goes back to what kind of training did Deputy Hall have and then the jury will take that information and factor it in in determining whether or not Deputy Hall acted reasonably on the day in question."  The court observed, "I don't think anyone should be testifying about *whether or not* there was a *violation* of sheriff's policy here."  (Italics added.)  The court explained:  it is "not relevant that the department may have cleared him," and "[t]his is a criminal trial and it will be up to 12 jurors to decide whether or not he acted reasonably in his use of force."  For the same reason, the court precluded any expert testimony as to whether Hall acted in lawful self-defense.

In her opening statement, the prosecutor began to recite the Sheriff Department's policy on vehicle pursuits, and Hall's attorney objected.  The trial court noted the objection and stated it would be addressed at another time, and the prosecutor continued her opening statement, interspersing departmental policy with her descriptions of Hall's conduct.

Outside the presence of the jury, Hall's attorney explained his objection, complaining that the prosecutor stated that Hall had violated policy.  The trial court correctly observed that the prosecutor had not actually said Hall *violated* the policy but merely stated what the policy was, although the implication was that Hall had violated it.  The court reiterated its ruling: "Let it be clear though that I did grant the in limine that there was to be no argument and no evidence presented as to Deputy Hall violating Contra

12

Costa policy. The policies can be put into evidence. The conduct of Deputy Hall can be put into evidence. And then the jury has to make a determination."

Defense counsel asserted that, if the prosecutor was going to argue that Hall violated policy, the defense should be able to "bring in evidence that he didn't violate policy, including the fact that there was a full investigation conducted." The trial court confirmed that "whether or not Deputy Hall violated department policy is not an issue that's to be litigated here. So, the People walk a fine line here because on the one hand it is relevant to the issue of reasonableness, whether a police officer is conducting himself in accordance with department policies; on the other hand, you run the risk of invading the province of the jury on the issue of reasonableness because the issue is[,] was Deputy Hall reasonable in his belief that he needed to use deadly force to [meet] deadly force. It's not whether or not he violated some technical aspects of vehicle pursuit policy. So, are we clear, Prosecution?" The prosecutor replied, "Yes." As described above, the prosecutor thereafter introduced evidence of Hall's training and departmental policies on vehicle pursuits, barricading, high-risk stops, and use of force.[3]

In sum, the trial court allowed evidence of the departmental policies on which Hall was trained, precluded evidence of the department's

---

[3] While testifying, Sergeant Martin expressed confusion as to what he could say given the in limine rulings. The trial court explained, "What you are allowed to testify about—or I shouldn't say allowed, or what this case is really about in terms of the jury is policies, what were the policies, what's the training, and then the jury will factor that policy training along with other facts and determine whether or not Deputy Hall's actions were reasonable at the time. So they're not going to be asked to determine whether or not any policy was violated, they're going to be asked to determine whether or not Deputy Hall's actions were reasonable under the circumstances."

13

determination that he had not violated any policies, generally prohibited evidence or argument as to whether any policies were "violated," but allowed argument that Hall acted inconsistent with the policies on which he was trained and therefore his conduct was unreasonable.

### 2. Abuse of Discretion

Respondent insists that the prosecution's evidence of Hall's training on high-risk stops, pursuit policy, barricading, and use of force was relevant to determine his mens rea. For the voluntary manslaughter charge, Hall's training was germane to whether he knew his actions were dangerous to human life and whether he deliberately acted with conscious disregard for human life when he shot and killed Arboleda. It was also relevant to whether Hall acted in lawful self-defense, which required the jury to consider what a reasonable person in a similar situation and with similar knowledge would have believed, and whether he applied reasonable force.

Hall's point, however, is not that the prosecutor's evidence was irrelevant, but that even though the prosecution was allowed to produce evidence that Hall violated departmental policy (and therefore acted unreasonably and with conscious disregard for life), Hall was not allowed to produce evidence that he did *not* violate policy and that his conduct was therefore reasonable, particularly for purposes of his self-defense theory. We review these evidentiary rulings for abuse of discretion.

### a. *The Internal Department Report and Ruling*

The trial court did not abuse its discretion in excluding evidence of the Sheriff Department's report that had cleared Hall of departmental violations. This internal investigation, including its conclusion as to whether Hall departed from departmental policy, would have risked the jury deciding the case based on the department's evaluation of whether Hall followed internal

14

protocol, rather than on the jury's own evaluation of whether Hall acted reasonably under the circumstances. (See *Thompson v. City of Chicago* (7th Cir. 2006) 472 F.3d 444, 458; *People v. Brown* (2016) 245 Cal.App.4th 140, 168–170 (*Brown*) [jury would look to an internal affairs investigator and member of the police department's use-of-force board as a better judge than they of the reasonableness of the officer's tactics].)

### b. *Other Evidence That Hall Did Not Violate Policy*

Hall and respondent assume that, for Hall to introduce other evidence that he did not violate department policy, Hall would have needed to call an expert in police procedures. For expert witness testimony to be admissible, it must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) Even then, an "expert must not usurp the function of the jury" (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1099), and it is the exclusive province of the jury to resolve any conflicts in the evidence (see *People v. Ochoa* (1993) 6 Cal.4th 1199, 1206).

The parties debate whether expert testimony that Hall did not violate policy would have been permissible under Evidence Code section 801. Hall contends that whether his actions were consistent with the Sheriff Department's Policy and Procedure Section 1.06.52, regarding vehicle pursuits (including barricading), and Policy and Procedure Section 1.06.61, regarding the use of force, were subjects sufficiently beyond common experience that expert testimony would have been useful. Respondent disagrees.

Respondent points us to *Brown, supra*, 245 Cal.App.4th 140, which held it was error to allow an expert to testify about officer training on the use of force and opine that the force used by the officer was justified. The court of

15

appeal explained that the testimony was improper because at issue was not a specialized law enforcement tool, but the officer's use of his fists, which the jury could evaluate without the need for expert testimony. The testimony also improperly summarized the law and invaded the province of the jury to evaluate the reasonableness of the force employed. (*Id.* at pp. 165–169.)

Both parties try to find support in *People v. Sibrian* (2016) 3 Cal.App.5th 127 (*Sibrian*). There, the defendant had refused to exit his vehicle after a traffic stop and officers punched, tased, and handcuffed him. (*Id.* at pp. 129–130.) The trial court ruled that an expert could not testify that the officers' conduct was reasonable or constituted excessive force, which would be for the jury to decide. (*Id.* at p. 134.) But it allowed the prosecutor to call an expert "in the area of law enforcement training, law enforcement tactics, and law enforcement procedures regarding the use of force" and opine, based on a hypothetical similar to the facts of the case, that the officers' conduct was consistent "with the industry standard." (*Id.* at p. 131.) The court of appeal affirmed because "jurors would not necessarily know about the need for escalating force in response to a noncompliant suspect." (*Id.* at p. 134.)

Hall's case, involving his training on high-speed pursuits and high-risk stops, is arguably closer to *Sibrian* than it is to *Brown*, which only involved an evaluation of an officer's use of his fists. If so, Hall should have been allowed to present expert testimony on whether he complied with the policies that the prosecutor insisted he breached. In fairness, since the prosecutor elected to prove that Hall acted unreasonably by showing his conduct was contrary to the departmental policy with which he was trained, the defense should have been allowed to call an expert to explain why Hall's conduct actually conformed with that policy—not to prove whether or not a policy was

violated, but to equip the jury to decide whether Hall's conduct was reasonable or in conscious disregard for human life. Indeed, the fact that the prosecution introduced the policies through other peace officers who, in effect, testified as experts arguably compounded the unfairness to Hall.

That said, the record is not clear that Hall ever *asked* to present an expert on the specific issue of whether his conduct was consistent with the policies with which he was trained—or that the trial court would have rejected such a request. Hall sought admission of the internal departmental report that concluded he did not "violate" policy, and the court indicated it would not allow evidence or argument that departmental policy was (or was not) violated. But the court was open to evidence and argument that Hall acted consistent with his training. It cannot be said that the court abused its discretion if it was never asked to exercise it.

Ultimately, we need not decide whether the trial court abused its discretion in ruling as it did. As discussed next, even if the court erred, the error was harmless.[4]

3. Harmless Error

Where a trial court has erroneously excluded evidence under state evidentiary rules, we consider whether it is "reasonably probable the jury would have reached a result more favorable to" the appellant if the evidence had been admitted. (*People v. Alcala* (1992) 4 Cal.4th 742, 791; *People v. Richardson* (2008) 43 Cal.4th 959, 1001, quoting *People v. Watson* (1956) 46

---

[4] Respondent argues that the evidence was also inadmissible under Evidence Code section 352 because it would have caused an undue consumption of time and confusion for the jury. Although the trial court did not rely on that reasoning, we may affirm the court's ruling on any ground. (*People v. Chism* (2014) 58 Cal.4th 1266, 1295, fn. 12.) But since we conclude that any error in excluding the evidence was harmless, we need not decide this alternative theory of exclusion.

Cal.2d 818, 836 (*Watson*) [*Watson* harmless error standard applies in cases of erroneous admission or exclusion of evidence].)

Here, both counts required the prosecutor to prove that Hall "did not act in self-defense." On this issue, evidence that Hall's conduct was consistent with his training and departmental policy may have been relevant to whether Hall *reasonably* believed that the immediate use of force was needed and whether Hall used no more force than was *reasonably* necessary for purposes of self-defense. The question, therefore, is whether the admission of the evidence would have led a juror to conclude that Hall acted reasonably in firing 10 shots at Arboleda as Arboleda's Honda rolled through the gap at approximately six miles per hour.[5]

Hall fails to establish this. Although Hall states generally that the trial court precluded evidence that he did not violate departmental policy, he does not point to any offer of proof that he had an expert prepared to testify or what the testimony would have been. Absent such an offer of proof, it is impossible for us to determine whether any erroneously excluded evidence would have been prejudicial. Even if we assumed that Hall could have found an expert to testify along the lines of the opinions in the Sheriff Department's report, Hall does not provide a record citation for the report—which does not appear to be in the record. Nor does Hall identify any specific opinion in the report, or any policy to which Hall adhered, that would have led a juror to find a reasonable doubt as to his guilt.

---

[5] Although the trial court did not instruct the jury on defense of others as to count 2, that does not change the analysis here, because the analysis is the same as to both self-defense and defense of others.

18

Hall argues that this was a close case on the issue of self-defense or defense of others because of the amount of time jurors spent on the issue and the questions they asked during deliberations. (Citing *People v. Woodard* (1979) 23 Cal.3d 329, 341 [six-hour deliberation and conflicting evidence suggested the case was close]; *People v. Pearch* (1991) 229 Cal.App.3d 1282, 1295 [juror questions and requests for readback indicated a close case].) He also points to the fact that the jury voted 7–5 to acquit on the voluntary manslaughter count. (Citing *People v. Epps* (1981) 122 Cal.App.3d 691, 698 [verdict reflecting jury's selective belief in the evidence indicated prejudicial error].) It is true that the jurors asked questions pertaining to CALCRIM No. 505 (self-defense or defense of others) as to count 1, and one of those questions asked whether, in deciding voluntary manslaughter, they should take into account all evidence "(including police policies, procedures, etc.)" or just the "moments of the actual shooting." But we cannot discern from the record what portion of the jury's deliberations pertained to self-defense or defense of others. Moreover, there is no indication that the jurors' concerns had anything to do with the subject of the excluded evidence—whether Hall's actions complied or did not comply with departmental policy. Jurors asked whether they could *consider* police policies, but that does not mean they were on the fence as to whether Hall complied with them. In any event, absent an offer of proof, we cannot determine whether the excluded evidence would have tipped the balance regardless of how close the issue was for the jury.

Hall also argues that the prosecutor, especially in closing argument, relied heavily on the idea that Hall's acts were inconsistent with departmental policy. Specifically, Hall contends the prosecutor "explicitly argued that [he] did not follow the Sheriff department's 'pursuit policy,' or the department rules regarding (1) barricading (2) pursuit or (3) the use of force."

19

There is nothing wrong, however, with the prosecutor arguing the significance of the evidence. The trial court allowed defense counsel to do the same, explaining to Hall's lawyer outside the jury's presence that, although he could not argue there was no evidence Hall *violated* his training or departmental policies, he could argue that Hall "did not act inconsistently . . . with his training." In response, defense counsel said, "I got it, that's fine." Counsel proceeded with his closing. Hall fails to show that unspecified expert testimony would have made his arguments so much more persuasive that any juror, otherwise convinced of his guilt, would have found a reasonable doubt.

Hall further contends that the exclusion of the evidence not only violated state evidentiary rules but also infringed on his constitutional rights to a fair trial and due process, and therefore the issue of harmless error should be evaluated under *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*) [requiring "harmless beyond a reasonable doubt" for errors of constitutional dimension]. We disagree.

The exclusion of expert testimony as to whether Hall violated specific departmental policies did not constitute "the complete exclusion of evidence intended to establish an accused's defense." (*People v. Cunningham* (2001) 25 Cal.4th 926, 999.) Hall was free to—and did—make the case that his conduct was consistent with his training on high-risk stops and pursuits and that he fired in self-defense. Even without expert testimony that he did not violate departmental policy, Hall had a meaningful opportunity to present his defense. (See *Crane v. Kentucky* (1986) 476 U.S. 683, 690 [the Constitution guarantees criminal defendants " 'a meaningful opportunity to present a complete defense' "].) Accordingly, there was no federal constitutional error, and *Chapman* does not apply.

B. <u>Jury Instruction</u>

As to voluntary manslaughter, the trial court instructed on self-defense and defense of Sergeant Martin pursuant to CALCRIM No. 505. As to assault with a firearm, the court instructed pursuant to CALCRIM No. 875 that the prosecutor had to prove Hall "did not act in self-defense or in defense of someone else," but that instruction did not set forth the elements of those defenses. In instructing further with CALCRIM No. 3470—which can be used to state the elements of self-defense and defense of others—the instruction given by the court mentioned only self-defense, not defense of others. Hall argues that the specific instruction (CALCRIM No. 3470) prevailed over the more general instruction (CALCRIM No. 875), and therefore the instruction—specifically, the court's inclusion of self-defense but not defense of others in its reading of CALCRIM No. 3470—improperly allowed jurors to convict on count 2 without finding that the attempt to commit an injury was "unlawful." Hall's argument has no merit.

1. <u>Forfeiture</u>

The parties and the trial court discussed CALCRIM No. 3470 before it was read to the jury. The court stated it would include the language that "defendant reasonably believed *he* was in imminent danger of suffering bodily injury or was in imminent danger of being touched unlawfully 'while engaged in a lawful vehicular pursuit,' " leaving no question that the instruction would cover only *self*-defense. (Italics added.) Hall's attorney replied, "[t]hat works for the defense" and did not take issue with the instruction or request that it refer to the defense of Sergeant Martin.

Respondent argues that defense counsel's agreement to CALCRIM No. 3470 forfeited Hall's current claim. Hall counters that appellate review is proper because the purported error affected his substantial rights and

21

therefore no objection was required.  (§ 1259; *People v. Campbell* (2020) 51 Cal.App.5th 463, 499; *People v. Rivera* (1984) 162 Cal.App.3d 141, 146.) Further, Hall argues that once the trial court instructed on self-defense, it had a sua sponte duty to do so fully and correctly.  Because "[a]scertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim," we will proceed to the merits.  (*People v. Anderson* (1994) 26 Cal.App.4th 1241, 1249.)

      2.  <u>The Trial Court Did Not Err</u>

The trial court must instruct on general principles of law relevant to the issues and necessary for the jury's understanding of the case.  (*People v. Brooks* (2017) 3 Cal.5th 1, 73.)  Nonetheless, "[a] trial court's duty to instruct, sua sponte, on particular defenses arises ' "only if it appears that *the defendant is relying on such a defense*, or if there is *substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case*." ' "  (*People v. Maury* (2003) 30 Cal.4th 342, 424, italics added.)

CALCRIM No. 3470, entitled "Right to Self-Defense or Defense of Another (Non-Homicide)," bears this out.  It speaks of "lawful (self-defense/ [or] defense of another)," indicating that the trial court may choose whether defense of others should be included in the instruction or not.  The Use Note explains: "The court must instruct on a defense when the defendant requests it and there is substantial evidence supporting the defense.  The court has a sua sponte duty to instruct on a defense if there is *substantial evidence* supporting it *and* either the defendant is *relying* on it or it is *not inconsistent* with the defendant's theory of the case. . . .  Substantial evidence means evidence of a defense, which, if believed, would be sufficient for a reasonable

22

jury to find a reasonable doubt as to the defendant's guilt." (Italics added, bolding removed.)

Here, the trial court had no obligation to include a reference to defense of others in its reading of CALCRIM No. 3470, because Hall never relied on that defense and because there was no substantial evidence to support it.

### a. *Hall Did Not Rely on Defense of Others*

Hall represents that "the defense was that the shots Officer Hall fired during [a] 2.16 second interval were in self-defense/defense of another," and the " 'another' " was Sergeant Martin. To the contrary, Hall did not assert a defense of others theory in opening statement, in negotiating the jury instructions on count 2, or in closing argument.

In opening statement—long before the jury instruction conference— Hall's attorney repeatedly stated it was a "self-defense" case. She emphasized that Arboleda's car was heading directly at Hall, the tires were pointed in his direction, and Hall faced serious injury. She never mentioned any concern for Sergeant Martin or anyone else.

In closing argument, Hall's counsel only argued self-defense, not defense of others. Indeed, counsel repeatedly emphasized that Hall shot Arboleda to protect himself. For example, counsel stated: "The inquiry is as narrow as that gap between those two patrol cars and everything unfolded rapidly in an intense situation. Andrew Hall fired those shots *to protect himself* from being run over by a car." (Italics added.) Counsel later argued: "Here are the three elements of self-defense, but here's the proper lens to look at them through. He is not guilty unless the prosecution can prove beyond a reasonable doubt that . . . he did not reasonably believe *he* was in imminent danger. . . ." (Italics added.) "If it was reasonable for Deputy Hall to believe *he* was going to be hit by the Honda and injured seriously or killed, the

23

Honda did not actually have to have hit him. He just has to have a reasonable belief." (Italics added.) "[H]e began firing his weapon in order to stop the Honda from running *him* over." (Italics added.) "[T]raining says you can shoot at a moving vehicle in defense of *your* life." (Italics added.) Finally, counsel concluded: "Andrew Hall is not guilty because he was *reasonably defending himself.*" (Italics added.) Not once during his closing argument did defense counsel suggest that Hall believed he was defending Sergeant Martin.

### b. *No Evidence of Defense of Others*

Moreover, there was no evidence—let alone substantial evidence—that Hall reasonably believed Sergeant Martin was in danger *and* acted reasonably to defend him.

Hall did not testify. He refers us to Sergeant Martin's testimony that the gap between Martin's and Hall's vehicles was "narrow," Martin "saw Mr. Arboleda's car coming in [his] direction" as he pulled in, Martin was afraid Arboleda would " 'ram him' " because he "drove right at [Martin]," and he thought Arboleda was going to hit him. However, Hall's depiction of the testimony is inaccurate.

Sergeant Martin actually testified that, while he *initially* believed Arboleda was going to run into his vehicle, Arboleda *instead* made a "hard right" and attempted to go through the gap between Hall's and Martin's vehicles.[6] Martin thought Arboleda was not going to make it and was going

---

[6] Sergeant Martin did say that he lacked a clear view of Hall's location because Martin was "looking at the car that was driving at me." But he also testified that, by the time he heard the shots fired, the Honda was going through the gap between the cars. Martin explained: "I thought [Arboleda] was going to hit me, *but then he turned and went into that gap* between our two vehicles." (Italics added.)

to *hit Hall*, believing that Hall was standing in the gap. When Hall started shooting, Arboleda was venturing through the gap and Martin's concern was not that Arboleda was going to hit him with his vehicle, but that Hall was going to hit him with gunfire. Other percipient witnesses, namely Deputies Muller and Caruso, suggested that *Hall* was at risk of being hit by Arboleda. Officer Ruiz—on cross-examination by defense counsel—agreed that the wheels of Arboleda's car were pointed *at Hall* .

Moreover, even if a juror could conclude that Hall reasonably believed the Honda heading for him posed some imminent danger to Sergeant Martin, there is no substantial evidence that Hall "used no more force than was reasonably necessary to defend against that danger." (CALCRIM No. 3470.) Arboleda was driving through the gap toward Hall at roughly six miles per hour, while Martin remained inside his patrol vehicle. No juror would reasonably conclude that Hall firing 10 shots at Arboleda—including shots *in Martin's general direction*—was a reasonable defense against whatever little harm Martin faced from Arboleda. No substantial evidence supported a defense of others theory as to count 2.[7]

Because Hall did not rely on a defense of others theory and there was no substantial evidence to support that theory, the trial court was not obligated to instruct sua sponte on defense of others. Hall fails to establish that the court erred in not including "defense of Sergeant Martin" in its reading of CALCRIM No. 3470 as to count 2.

---

[7]     Hall assumes that, since the trial court mentioned defense of Sergeant Martin in instructing on defenses pertaining to voluntary manslaughter, the court must have found substantial evidence that Hall acted in Martin's defense. But Hall does not point to anywhere in the trial where the sufficiency of the evidence for defense of others was raised as an issue for the court to decide. As such, the mention of Martin in the CALCRIM No. 505 instruction bears no significance here.

25

### 3. Harmless Error

Even if we were to assume that the trial court should have mentioned "defense of Sergeant Martin" in reading CALCRIM No. 3470, or that some error arose because the instruction under CALCRIM No. 3470 contained no explicit reference to defense of others while the earlier instruction under CALCRIM No. 875 did, the failure to reference defense of others in CALCRIM No. 3470 would not compel reversal. We evaluate instructional error under *Watson*, *supra*, 46 Cal.2d 818. (*People v. Molano* (2019) 7 Cal.5th 620, 670 [court's failure to instruct on the affirmative defense of unreasonable belief in consent evaluated under *Watson*]; *People v. Beltran* (2013) 56 Cal.4th 935, 955 [" ' "[M]isdirection of the jury, including incorrect, ambiguous, conflicting, or wrongly omitted instructions that do not amount to federal constitutional error are reviewed under the harmless error standard articulated" in *Watson*' "].)

Just as the jury rejected Hall's claims of *self*-defense on count 2, the jury would have rejected a claim of defense of Sergeant Martin, especially since Hall was outside his patrol vehicle and far more exposed to Arboleda's car than Martin was. Again, we see no probability that a rational juror would have found that Hall was reasonably acting in Martin's defense when he fired 10 times, including in Martin's general direction, while Arboleda drove through the gap toward Hall at roughly six miles per hour and Martin was inside his own patrol car.

In contending the purported instructional error was prejudicial, Hall points us to the 7–5 vote for acquittal on the manslaughter charge. He argues that jurors were instructed on self-defense on the assault charge and found him guilty, so they must have rejected the self-defense theory. As to the manslaughter charge, however, jurors were instructed on self-defense

*and* defense of others, and seven jurors voted for acquittal. Thus, he urges, the rational explanation for the two verdicts is that the seven jurors voting for acquittal found that Hall acted in defense of another, and Hall would have obtained the same vote on count 2 if only the trial court had mentioned defense of Sergeant Martin in CALCRIM No. 3470.

We disagree. Given the absence of evidence supporting a defense of others theory, the 7–5 split on the manslaughter charge is not logically attributable to a juror's belief that Hall acted to defend Sergeant Martin. Instead, it is most likely attributable to the fact that manslaughter, unlike assault with a firearm, requires proof beyond a reasonable doubt that the defendant possessed a mens rea of intent to kill or conscious disregard for human life. Any error arising out of the court's instruction under CALCRIM No. 3470 was harmless.[8]

C. Cumulative Error

Reversal is required when the cumulative effect of errors deprives the defendant of a fair trial and due process. (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.) Hall contends that reversal is required here due to the combined effect of the errors alleged in his opening brief. Not so.

As we have explained, there was no instructional error, and any error in the exclusion of evidence was harmless. We further conclude that, even if

---

[8] Hall argues that the *Chapman* standard applies because jurors were given both proper and improper instructions on the " 'unlawful attempt' " element of assault. (Citing *In re Lopez* (2023) 14 Cal.5th 562, 591 [state must prove that no "rational juror who made the findings reflected in the verdict and heard the evidence at trial could have had reasonable doubt regarding the findings necessary to convict the defendant [absent the instructional error]"].) We disagree with Hall's premise, but in any event we would affirm even if *Chapman* applied. No rational juror could have had a reasonable doubt that Hall's conduct was unlawful based on a defense of others theory.

there was instructional error, that error was also harmless, and the two reputed errors collectively did not deprive Hall of a fair trial.  (See *People v. Mincey* (1992) 2 Cal.4th 408, 454 ["A defendant is entitled to a fair trial, not a perfect one"].)  We find no cause to reverse the judgment.

### III.  <u>DISPOSITION</u>

The judgment is affirmed.


CHOU, J.

We concur.


JACKSON, P. J.
SIMONS, J.


*People v. Hall* / A165142